Counsel, you may proceed. May it please the Court, my name is Richard Salgado and I am counsel for Ray Nakano in this appeal. I'm also going to ask to reserve five minutes of my 15 minutes. You may do so, counsel, but just watch your clock. This is an extremely unique case. It's unlike really any case that's come before it for the most part in this court or any other court as far as there are two reasons for that which I'm going to discuss in order. The first is the Air Transport Safety and Stabilization Act of 2001, which Congress enacted immediately following the September 11th terrorist attacks, and then also the fact that National Airlines, the airline at issue in this case, was operating as a debtor in possession, having already filed for bankruptcy prior to these events to give rise to this appeal. But, counsel, isn't your challenge to show us that these funds were, and I'll put it in quotes, encumbered? Yes, Your Honor, that is certainly one. There's two different ways, really, here that we can approach this. One is that the funds were encumbered, and that certainly became an issue later on. The other issue, however, is the actual funds themselves, whether the Bright Line rule. There's a very clear Bright Line rule and Bright Line precedent here as far as the imposition of the Trust Fund Recovery Penalty in 6672. Simply put, these funds are to be held in trust. That is made abundantly clear, and the case law on this is as bright line and clear as case law can really be, that once a company, once a business receives these excise taxes, they are to hold these funds. They're not segregated, but they're to hold these amounts, these funds, in trust. They are not to be used for any other purpose, period. This is abundantly clear. And for this reason, because this law is so well established and so clear, that gives rise to a Bright Line rule that allows the IRS to impose what really is one of the harshest penalties that it has, which is this Trust Fund Recovery Penalty in which it can go and collect these taxes personally from the executives who are deemed to have been responsible. This is a critical, critical distinction here, because, and I point the court to Slodoff, the United States, the Supreme Court has said that Section 672 cannot be read as imposing upon the responsible person an absolute duty to pay over. It does impose a penalty, and that is triggered by willfulness, and it's not intended to impose liability without personal fault. But wasn't that referring only to after-acquired funds? Slodoff in that case is certainly distinguishable in the sense that it was after-acquired funds. That is absolutely correct. However, there's an obligation already existing. The government's position in this case would be that taxes must always be paid over, period. It's a very, very simple calculus there. However, Slodoff, we would submit, actually alters that and says that there are exceptions, essentially. Now, this is different. It's a different sort of exception, to be certain. It's definitely, it's not, we're not arguing this after-acquired funds by any means. But we are, we are arguing that this is a unique case. It's very unique because when 6670, when the, when Congress enacted 6672, what it did, it had an effect upon these funds. To be clear, previous, I apologize for that, when Congress enacted the Stabilization Act, it had an effect on these funds.  Counsel, I just see no relationship, to be frank with you, about what bothers me about your argument between the Stabilization Act and the trust status of the funds. What the statute did is it said there shall be a two-month deferral and at, at a discretionary  But I see nothing in the text of the Act that alters the nature of the funds as distinct from purely the payment date. And what specific wording do you see that creates even an ambiguity as to the status of the funds? Well, Your Honor, what I look to is not so much the wording in that particular provision, but the overall Act itself. Which was certainly meant to keep airlines operating. Well, regardless of the purpose, we have to start with what the statute says and what, in fact, it actually does. And the sort of fuzzy laudatory purposes really don't come into play unless there's some, at least, ambiguity in the text. And I'm struggling to see where there's some kind of implied repeal here, which is, you know, very disfavored under Supreme Court precedent. Absolutely, Your Honor. And I would, I would concede the words themselves. The statute did not have any express, explicit repeal. However, there was a purpose. It's well established that any act of Congress has a purpose. When Congress included that provision in the Stabilization Act. But the purpose, I think, is stated right in the statute, and that is the deferral of the payments. Are you reading a different portion of the statute to discern a different purpose? Or is the purpose that you're relying on really comes from the legislative history that you cited in your briefs? Well, it's really both, Your Honor. The purpose, the technical purpose, yes, was a two-month, it could be at the discretion of the IRS, a four-month deferral. That was the technical purpose. But why that? Why, to put this in context, there never previously had been such a deferral. This was really unprecedented. There didn't need to be, because these taxes, these sort of taxes, they should always be on hand. So, counsel, the identical statute, if people in Congress said, we're doing this because it's Tuesday and we're feeling really magnanimous and we're giving out candy and, besides, we're going to have a two-month deferral, no other purpose. But the operative language is the same. Would there be a different result? I mean, it's a very unusual argument that you're making, which is, well, don't worry about the words of the statute, which actually don't do anything like what I'm wanting it to do, but just look at the reason that motivated the people voting for this act. I just have difficulty with that concept. Well, Your Honor, I would submit that generally Congress does not just enact something like that for no reason, but just a sense of goodwill at that moment. There was a purpose there, and that's why. Well, my question to you is, with the identical operative wording, would the result be different if Congress had either said nothing at all or it had some completely unrelated frivolous goodwill reason for doing this? Would the result of the case be different? And if so, why? Where do you find support for that? Frankly, Your Honor, I think that here it's important to keep in mind that this had never happened before, and there was an unprecedented nature to it. And that really, to go to your question, I believe there this had never happened before. And traditionally, the 6672 trust fund penalty has operated based on clarity. That is one thing that you can never look into the history of the enforcement of that statute. At no time has there been ambiguity. It is an extremely clear, do not use these funds. These funds should be held in trust. You would never need to defer these funds out, because technically, if a company at any given time does not have the funds on hand to pay these trust fund taxes, that is because someone has done something they shouldn't have done. They have reached into that proverbial cookie jar. They have used those funds for operating expenses, and there is a reason those funds are not on hand. So there simply isn't a reason to ever need to defer those funds. The funds should always be on hand. And again, here, the fact that suddenly these funds were not being immediately handed over to the IRS, implicit in that is that there is some other reason to have these funds. And time value of money is one of the reasons that the government has offered on this. And frankly, time value of money on this amount of money over a four-month span of time would not justify putting it into the ink of this statute. This really is, there is a purpose here, and that's why we submit that when Mr. Nakano was operating at that time, in the crisis going on with the various issues at hand, there was a purpose there, this deferral had never happened before, and so they injected that money into the operation of the airline. And that money was lost. Now, one of the government's arguments here has been that there was $21 million I believe also pursuant to the same statute, the same Stabilization Act, that was paid over to national airlines at the same time. That, we believe, supports Mr. Nakano's position here, and that there is every effort being made by the government to keep these planes in the sky, to keep them operating. And at that time, it was a very unique situation. These funds, the first time in history, for the first time ever, that trust fund taxes like this could be deferred, they were deferred. Mr. Nakano did what a reasonable person would do and believe there was a purpose for that. The Congress had not acted without a purpose. If we were to agree with you, would we be creating a split with the Fifth Circuit in the Conway matter? Absolutely not, Your Honor. That is, the Fifth Circuit on this looked at it somewhat differently. They, and I would say this has been a stumbling block that both the Fifth Circuit had as well as the lower court here. And that stumbling block is the mistaken belief that Mr. Nakano's argument has been these taxes were forgiven. They were never forgiven. At no time did the government advance any plan or purpose to forgive this debt. However, there's lots of debts and there's lots of taxes that are owed to the government that do not carry this same trust fund recovery penalty aspect. There is no personal liability, for example, for corporate income tax or estate taxes or government-backed loans. There is no personal liability on those. Here we would submit that this is distinct from the Fifth Circuit for exactly that reason. Factually, it's the same, but the argument being presented to you is fundamentally different. And with that, I'll reserve the remainder of my time for rebuttal. You may do so, counsel. We'll hear from the government. Good morning, Your Honors. My name is Jennifer Rubin, and may it please the Court, I represent the United States in this case. Ultimately, many things about this case are simply not disputed. It's really not disputed that Mr. Nakano was responsible to pay over the taxes and that instead he paid other creditors knowing that the taxes were going unpaid. It's also really not disputed that the plain language here simply extended the due date. And that's what was found in Conway in the Fifth Circuit decision. You know, what Conway said was we only find that the language extended the due date. We do not find any expression in the statute of intent to permit airlines to use it as working capital. That's why, in fact, there would be a conflict with the Fifth Circuit if you were to rule otherwise here. Ultimately, you know, you look at the legislative history, nothing in the legislative history indicates any intention to use this statute in any way to alter the trustful nature of the taxes. You don't find the plain language. You don't find the legislative history. So what we really have here is a situation where Mr. Nakano is asking this Court to infer an implicit policy from the statute. Use that to alter the plain language reading not only of the Stabilization Act, but also of Section 6672 and 7501 of the Internal Revenue Code to alter the trustful nature of the statute and to find that there could be no penalty against someone like Mr. Nakano who paid out millions and millions and millions and millions of dollars to other creditors in preference to the United States knowing that the basis for that. They've cited nothing that says that this Court can do it. They've cited nothing that says that this Court should do it. What they've tried to do is rely on an incorrect reading of the Slodoff case, which as this Court held in Davis, is simply not the correct reading. Slodoff simply stands for this. If you have a change in control, and at that time of change of control there's no liquid funds, then you cannot find 6672 liability for the new person in charge for taxes that were owed to him. It's really a nuance about who's the responsible person in a way, is it not? Absolutely. Absolutely. Now, Slodoff even makes clear that if there has been liquid funds available at the time that you have a new person comes in charge, and those tax – and that could have been used to pay the taxes that were owed from before the change in control, he would still have willfulness, he would still have liability there. Here we have somebody who was a responsible person throughout the time frame. 100 percent of the time, Mr. Nakano was a responsible person. And he knew, he was warned, he was told that these taxes were due and that he needed to start setting aside money. He says, I'm not going to do that. I just don't think we can. Now, the second thing that he's attempting to use is just simply this argument that if you have this implicit policy that he's tried to tease out of the statute and Mr. Nakano says was somewhere within the statute, though he can't point to anything that supports that implicit policy, that you should then use that to repeal by implication Section 6672 and 7501. And under the Regional Rail Reorganization Act, Morton and Branch, that simply is not appropriate. If you can read the statutes to be consistent and to have effect, you should read the statutes to have effect. And by reading the Stabilization Act as simply extending the due date, and reading Section 6672 and 7501 as having their normal, regular effect that they've always had, you have no conflict. So there's absolutely no reason to be trying to find an implicit repeal here. And finally, Mr. Nakano is asking this Court to engage in speculation as to Congress's policy, intended policy in doing an extension of time. You know, ultimately, all they did was extend the time. They didn't say, I'm extending the time because we want you to use this as working capital. They could have extended the time for many different reasons, and some of those were explored in the briefs. It could have been that they wanted to give the airlines time to figure out their financial situation before they emptied out their accounts to pay these taxes. It could have been for the time value of money. It could have been simply because they were trying to delay any airline failures that might occur. You know, the Lewis and Note that was at 457, this was cited in both the appellant's brief, says Congress's goal with the entire Stabilization Act was simply to delay airline failures in the short term. So what would have happened here if Mr. Nakano had said, okay, we have to pay the taxes in January 2002, maybe National Airlines fails then. But other airlines wouldn't have failed at all. Maybe some fail in January 2002, others limp along for a while longer. Maybe ultimately you get some failures and they get spread out. That is perfectly consistent with reading the statute by its plain terms. Turning briefly to the bankruptcy argument, if I may, ultimately their entire bankruptcy argument is built on a false premise. And that premise is that post-petition taxes are a lower priority than operating expenses. This is simply not true. If you look at 11 U.S.C. sections 503b1b2c and 507a1, it makes clear post-petition taxes are the same priority as operating expenses. And that is also bolstered by 28 U.S.C. section 960 and by bankruptcy district Nevada rule 960, which says, yeah, you have to pay the taxes on time while you're in bankruptcy, while you're a debtor in possession. And Southern Railway explains why and explains the central failure of understanding that sort of underlies all of this. Mr. Nakano wants this court to focus on the fact that you needed gasoline and airplanes and pilots to take passengers from point A to point B. But the fact is they were not legally permitted to take passengers for money from point A to point B without collecting these taxes and paying them over. These taxes never belonged to National Airlines. They were only they were acting as a tax collector. They should have paid them over. Nothing in the Bankruptcy Code alters that. Nothing in the Stabilization Act changes that. Nothing in the legislative history of the Act changes that. Nothing changes that. If there's no further questions. Scalia. Does the government have an attitude on what is the reality, and that is that notwithstanding that these are trust funds, many airlines dip into them until the time comes to pay? I don't know that we actually do have that understanding. I mean, I think our general position is that you're not required, unless you believe the taxes are at risk, and that's the Thibodeau case, to segregate the taxes. And so it's all in the same pile of money. But as the Beshier case makes clear, our trust is over the amount, not the specific dollars. So I don't think that there's any – I've not seen anything that indicates that there was an understanding at the IRS or otherwise that airlines were dipping into the tax fund – to the tax trust funds to any extent. I mean, I just have not seen anything along those lines. But the fact is that unless you believe that the taxes are at risk – and again, that's the Thibodeau case – you're not required to segregate them, and you're not required – if – when I bought my plane ticket to come to San Francisco for this argument, I paid taxes. And that went into the airline's general fund. And they're not required to pay over the dollar that my credit card sent to the airline. But they're required to pay over whatever dollars were paid to the airline. So. Thank you, counsel. Thank you. For all the reasons stated in our brief, we urge you to affirm. Thank you. Mr. Salgado, you have some reserve time. Yes, Your Honor. Not very much for a few minutes. I first wanted to just address the fact that the government immediately has run back to what they've said before, which is that national did not – these funds did not belong to national. I just want to clarify again. It's our position. It has never been otherwise. These funds, of course, did not belong to national. They were always the government's funds at all times. The argument here really goes to those bright-line rules that define what can be done with those funds and the nature of those funds. Under a hyper-technical reading – we've talked quite a bit about SLODOF here today. And I've submitted that under a hyper-technical reading of 6672 in the statute, it could be argued that hyper-technically, Mr. McConnell loses in this case. However, that would also be true under SLODOF. The simple fact is that 6672 is predicated on bright-line rules. It is predicated on clarity in the law. And what we were dealing with at the time in 2001 and 2002 was an abundant lack of clarity, that clarity of the bright-line rules were dimmed. And under that, nevertheless, the IRS is seeking to impose the harshest penalty it has. Turning very briefly to bankruptcy arguments that are at issue here, the government cited and continues to rely upon a local bankruptcy court rule in the District of Nevada at that time that held that the taxes had to be paid immediately, essentially. And that actually – that local rule has since been amended. And, of course, the previous version of the rule would apply here. Nevertheless, a local rule is not superseding the federal statutes, which is 503 and 507 of the Bankruptcy Code. I would submit upon careful reading, do put taxes that are past due, ultimately behind as an extraordinary expense. Those taxes do become a lesser priority than the outpouring expenses, again recognizing that the priority of bankruptcy is to preserve the estate. And for that reason, it's very interesting what happened. The government's position here is that on January 15th, national insurance was shut down. That's the argument. January 15th, the taxes came due. If they could not pay them without shutting down, the government – the national insurance was shut down. However, what's interesting in this case is that national did eventually shut down. National shut down in November of that year. And at that time, the government still did not receive those funds. That's because the estate was liquidated. When the airline shuts down, it's liquidated. There's already a debtor in possession. There's already a bankruptcy. Chapter – it converted to Chapter 7 bankruptcy at that time. And the government still did not receive the funds. And so what we're really dealing with here is a situation where the funds, for various reasons, did become encumbered. And it's a very unique case. This is, frankly, unlike any other case I've seen, and I've read through a lot of them in this case. It's unlike any other case, really, that you see imposing 6672. And for that reason, we submit that Mr. McConnell here was not willful and that the Trust Fund Penalty Act simply should not apply and urge you to reverse. Thank you very much, counsel. The case just argued will be submitted for decision.
judges: O'scannlain, Graber, Nguyen